Filed 11/10/22  Liang v. Li CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| KAI HOU LIANG,<br><br>    Plaintiff, Cross-defendant, and Appellant,<br><br>    v.<br><br>JI LI,<br><br>    Defendant,<br>    Cross-complainant, and Appellant;<br><br>BCP, INC.,<br><br>    Cross-defendant and Respondent. | B305549, B307349<br><br>(Los Angeles County Super. Ct. No. BC710478) |

APPEALS from judgments of the Superior Court of Los Angeles County, Michael Linfield, Judge.  Affirmed in part; reversed in part.

Fernald Law Group and Brandon C. Fernald for Plaintiff, Cross-defendant, and Appellant.

Park & Lim, S. Young Lim, Dennis McPhillips, and Jessie Y. Kim for Defendant, Cross-complainant, and Appellant.

Steinbrecher & Span, Geoffrey T. Stover, and Andrew Huang for Cross-defendant and Respondent.

———————————————

These appeals arise from litigation between Kai Hou Liang, who lives in China, and Ji Li, who lives in the United States. In 2016, Li approached Liang about investing in a venture that would acquire and then develop a parcel of land in Hollywood, located at 6140 Hollywood Boulevard (6140 Property). The 6140 Property had been the subject of a purchase contract executed by Li in 2014. Despite several extensions of the escrow, Li had been unable to accumulate the funds necessary to complete the purchase at the contractual price of $9.5 million. In March 2016, Li, Liang and a third investor named Yong Bai[1] reached agreement on the terms under which an entity named Hollywood Garden LLC (Hollywood Garden) would be formed to acquire and develop the 6140 Property. They executed an agreement which provided for the three investors to make prescribed contributions of invested capital and made Li the managing shareholder. Liang agreed to and did invest an initial $5.48 million into the

---

[1] Yong Bai is not involved in this litigation. However, an unrelated individual named Betty Bai was a witness at trial and there are issues raised in this appeal by Li regarding evidentiary rulings pertaining to her testimony. See section A.4. of the Discussion, *post*. To avoid confusion, we shall refer to these two individuals by their full names.

project. Based on Li's written representations, Liang believed that Li had already invested $1.3 million in the project and would invest an initial $3.53 million, which, combined with Liang's investment, would be sufficient to consummate the purchase of the 6140 Property. In derogation of the investors' agreement, Li failed to contribute his funds, proceeded to use Liang's contributed capital of $5.48 million to place substantial non-refundable deposits on the 6140 Property and ultimately obtained a $4 million loan in Hollywood Garden's name (secured by the 6140 Property) in order to finance the purchase. The loan had a term of only one year, with an option to extend for a second year. Li also caused Hollywood Garden to expend substantial sums paying fees and points associated with the loan, interest on the loan, and later to extend the term of the loan to two years. In addition, Li withdrew money from Hollywood Garden's account for his own purposes. As a result, Hollywood Garden's finances were depleted and its only substantial asset was the 6140 Property, burdened by a short-term $4 million loan.

In 2018, BCP, Inc., a California corporation, acquired the promissory note for Hollywood Garden's loan and declined to extend the loan term. Hollywood Garden defaulted on the loan.

Liang filed suit against Li alleging fraud and various other causes of action. Li cross-complained against Liang and BCP, alleging the existence of an oral contract that he could finance his equity in the venture through a loan secured by the property, and alleging that Liang and another Chinese national, Ying Wei Lu, wrongfully colluded to form BCP to acquire the $4 million promissory note and trigger its default.

The trial court granted Liang's and BCP's motions for judgment on Li's cross-complaint under Code of Civil Procedure

3

section 631.8.  A jury returned a verdict for Liang on his complaint against Li and awarded Liang $2 million in compensatory damages for his lost profits up to the time of trial on the $5.48 million he had invested and also awarded $200,000 in punitive damages.  Through various posttrial briefing, Liang sought imposition of a constructive trust over Li's 40.3 percent interest in Hollywood Garden as a remedy for Li's unjust enrichment.  The trial court entered judgment for Liang and BCP against Li on the cross-complaint, and entered a judgment for Liang on the complaint, which included $200,000 (the punitive damages component of the jury award) and a constructive trust on all of Li's interest in Hollywood Garden.  The judgment also included attorney fees and costs to both Liang and BCP. However, the court denied Liang's request to include the jury's $2 million compensatory damages award in the final judgment.

Li contends that the trial court erred by imposing a constructive trust on his interest in Hollywood Garden, and that we should reverse the judgment because of erroneous rulings the trial court made leading to and during trial.  On cross-appeal, Liang contends that the trial court erred when it declined to both impose a constructive trust on Li's interest in Hollywood Garden *and* award a $2 million monetary judgment.

We find no error in the court's judgment against Li on his cross-complaint and in the court's decision to award a constructive trust.  However, we reverse the court's judgment denying Liang the $2 million compensatory damages award rendered by the jury in its verdict.

## BACKGROUND

### A. Hollywood Garden

Liang and Li met in 2014, when Liang made his first trip to the United States. The two were introduced by a mutual friend, who recommended Li to Liang as a potential investment partner for real estate in the United States. After their meeting, Liang invested with Li in property in Yorba Linda in 2015. Li first contacted Liang about the Hollywood Garden project in March 2016.

Liang testified that Li called him "urgently," asking for a favor—to "invest in [the Hollywood Garden] project by sending money in quickly, because [another] investor was not reliable." Liang flew to Los Angeles the next day to meet with Li about the project. Over the following three days, Liang, Li, and Yong Bai negotiated the terms of the parties' investment in the Hollywood Garden project.

Liang and Li signed a document on March 25, 2016, that outlined the terms of their agreement, which was to be funded in three parts. It represented that Yong Bai and Li had already jointly invested $2.6 million ($1.3 million apiece) in the project. The agreement referred to the $2.6 million as "the first phase" of the project, and represented that "[t]he funding for this phase is complete."

"Funding for the second phase," the agreement stated, was to total $12 million, and was to be provided by Liang and Li. Liang was to fund $7.3 million, and Li was to provide $4.7 million. Each was to provide their share of funds "in two separate transactions each." Liang was to contribute in transactions of $5.48 million and $1.82 million, and Li was to contribute $3.53 million and $1.17 million. "After the second

5

phase of funding is complete," the agreement said, "[Liang] will have invested [$7.3 million] in total, [Li] will have invested [$6 million] in total, and [Yong Bai] will have invested [$1.3 million] in total. So [Liang] will have 51 [percent] equity, [Li] will have 40.3 [percent] equity, and [Yong Bai] will have 8.7 [percent] equity in the project." "Should one party fail to contribute," the agreement provided, "the corresponding shares are to be adjusted in accordance with the actual invested amount."

Liang wired $5.48 million to Hollywood Garden's bank account on March 28, 2016. Li never contributed any of the funds to Hollywood Garden that he had agreed to contribute.

In March and April 2016, Li wired $4.8 million of Liang's $5.48 million to an escrow company as non-refundable deposits for the purchase of the 6140 Property.

## B.    Li's Loan

Liang's contribution, without any of the additional promised capital from Li, was not sufficient to close escrow on the 6140 Property. In May 2016, Li inserted Liang's electronic signature on a Hollywood Garden corporate resolution allowing Hollywood Garden (through Li) to acquire a $4 million loan secured by the 6140 Property.[2] The loan was for a term of one year with the option to extend for another year for $50,000.

---

[2] The loan that Li acquired for Hollywood Garden is referred to throughout the reporter's transcript as a "hard money" loan. According to one of the expert witnesses who testified at trial, "[y]ou only use a hard money loan if you know you can get out of a project within 12 months. Hard money lenders are focused on gaining the asset rather than being part of the project."

Escrow closed on the 6140 Property on May 13, 2016, funded almost entirely by Liang's investment and the $4 million loan. Hollywood Garden made the required payments on the loan each month.

Liang became suspicious about the Hollywood Garden project when he requested capital statements for the project and Li never provided them. In December 2016, one of Li's friends visiting China told Liang about a loan that "Li had successfully obtained" on the Hollywood Garden project. Liang contacted others who had invested in the earlier Yorba Linda project, and together they invited Li to Beijing for a meeting in March 2017 to discuss the projects. Li admitted to the assembled group that he had taken out the loan, but told the group that the loan was a personal guarantee loan. Liang "requested strongly" that Li pay back the loan, and Li promised to do so. Li never paid back any of the money.

Rather than making any personal payment on the loan, however, in May 2017, Li paid $50,000 from a Hollywood Garden account to exercise the option to extend the term of the $4 million loan to May 2018.

In July 2017, the Hollywood Garden investors met in California and voted to remove Li as manager of Hollywood Garden and to remove him from all of the entity's bank accounts.

BCP bought the loan at some point between July 2017 and its maturity in May 2018. Hollywood Garden defaulted on the loan in May 2018.

## C.    The Litigation

Liang filed a complaint in the trial court on June 15, 2018, and a first amended complaint on June 26, 2018, alleging fraud, negligent misrepresentation, unfair business practices (Bus. &

7

Prof. Code, § 17200 et seq.), breach of contract, breach of the covenant of good faith and fair dealing, and breach of fiduciary duty. At trial, Liang dismissed his causes of action for breach of the implied covenant of good faith and fair dealing, negligent misrepresentation, and unfair business practices.

Li filed a cross-complaint in December 2018. Li alleged the existence of an oral agreement between himself and Liang with terms different than the parties' written agreement—specifically that, despite the written agreement, he was permitted to fund his investment through a loan secured by the 6140 Property. He also alleged that Liang had essentially engineered the creation of BCP to take over the $4 million Hollywood Garden loan and foreclose on the 6140 Property, thereby securing the property for himself. Li's complaint alleged four causes of action: specific performance of the alleged oral agreement, unfair business practices (Bus. & Prof. Code, § 17200 et seq.) against Liang and BCP, a derivative claim on behalf of Hollywood Garden against Liang and BCP for breach of fiduciary duty, and declaratory relief against Liang and BCP.

Shortly before the August 2019 trial, Liang moved the trial court for an order adding a constructive trust remedy to the first amended complaint. The trial court granted the motion.[3]

Among other pretrial motions, Liang also filed a motion for a determination that Betty Bai, who had worked for Hollywood

_____

[3] Li's contention that the court granted the motion after the close of trial is contrary to the record. A minute order dated August 23, 2019, corrected an August 12, 2019, minute order nunc pro tunc to indicate the court granted the motion for leave to amend the first amended complaint to add a constructive trust remedy.

8

Garden as a bookkeeper, was unavailable to testify at trial. There is nothing in the record, however, to indicate that the trial court ever ruled on this motion. Instead, at trial, when Liang sought to introduce Betty Bai's deposition testimony, the trial court had an exchange with counsel regarding whether Betty Bai was subpoenaed to testify. The exchange concluded with the trial court allowing the deposition testimony to be read as Betty Bai's testimony. "I don't think there's any real question that [Betty Bai] was subpoenaed," the trial court said, "and there's a proof of service on that. . . . I'll allow the deposition because she is not here." During the discussion, the trial court highlighted and reiterated that Li's motion in limine was based entirely on unavailability, and not based on whether Liang's counsel had unsuccessfully sought to secure the witness's presence at trial.

Li had also served on BCP a notice to attend trial and produce documents to the person most qualified of BCP, Inc., Ying Wei Lu. BCP filed a motion to quash the notice on the ground that Lu is not a resident of California. BCP also filed a motion in limine to exclude trial testimony regarding Lu's "past career as a government official in China and to preclude from evidence any and all references to Lu's purported financial condition." The trial court granted both of BCP's motions. The trial court concluded based on the evidence before it that Lu was a resident of China and could not be compelled to appear at the trial. "[A] [n]otice to [a]ttend may only compel the attendance of individuals who are California residents at the time the notice is served," the trial court explained. The trial court continued, "although Lu is a managing agent of BCP, Inc. as he is the principal and shareholder of BCP, Inc. . . . , he was not a resident of California at the time the notice to attend the trial and produce

9

documents was served. . . .  Because he was a nonresident at the time the notice to attend trial and produce documents was served, Lu cannot be compelled to attend trial, nor produce the documents sought in the notice, pursuant to Code of Civil Procedure section 1989."  The trial court also granted BCP's motion in limine regarding Lu's career and financial condition.

During the trial, Liang also objected to the introduction of emails between a gentleman named Terence Lai and other individuals who were also not trial witnesses.  Lai appears at some point to have been employed by Li and was also described in the reporter's transcript as the purchasing agent for BCP when it purchased the Hollywood Garden loan.  The trial court sustained Liang's hearsay objection, but informed Li's counsel that if they wanted the documents admitted, they would have to bring in a witness or witnesses or testify about them.

After the parties rested, Liang and BCP moved the trial court for judgment on Li's cross-complaint under Code of Civil Procedure section 631.8.  The trial court granted both motions—BCP's before the jury began deliberating and Liang's after the jury began deliberating.

The jury found in favor of Liang and against Li on the three remaining causes of action in Liang's complaint (fraud, breach of fiduciary duty, and breach of contract) and found that he had been damaged in the amount of $2 million.  The jury also found that Li had acted with "malice, oppression[,] or fraud," and awarded Liang $200,000 in punitive damages.

After trial, the parties submitted briefs on the imposition of a constructive trust as a remedy.  Although the record contains no reporter's transcript or settled statement of any posttrial hearing, the parties' briefs suggest that the trial court heard

10

argument regarding the imposition of a constructive trust at a status conference on December 10, 2019. After the hearing, Liang submitted a brief in which he noted the court had expressed concerns that awarding both damages and a constructive trust would result in a "double recovery." He argued there would be no double recovery and he was entitled to a judgment for both the damages awards (including the $2 million compensatory damages award) and a constructive trust because "the respective remedies are premised on at least two (2) distinct harms proven at trial and present two (2) distinct remedies intended to address those distinct harms." Liang also submitted an alternative form of judgment awarding "constructive trust and punitive damages only." Li filed a response to Liang's request for entry of the judgment awarding both constructive trust and the compensatory damages.[4]

The trial court entered judgment on January 28, 2020, awarding Liang a constructive trust on all of Li's assets and

---

[4] Although it is impossible to discern from the record whether and when both documents were submitted, the record contains copies of documents entitled "[PROPOSED] JUDGMENT" and "[PROPOSED ALTERNATIVE] JUDGMENT." The proposed judgment purports to award Liang $2 million in compensatory damages, $200,000 in punitive damages, and a constructive trust on all of Li's assets and equity in Hollywood Garden. The proposed *alternative* judgment awards only $200,000 and the constructive trust. The trial court's docket notes only the filing of a single proposed judgment. It is possible that both the proposed judgment and proposed alternative judgment were filed as a single document. The documents in the appellant's appendix, however, have no file stamp(s) and no proof(s) of service.

11

equity in Hollywood Garden and $200,000 in punitive damages and otherwise disposing of all of the causes of action between Liang and Li. Li filed a notice of appeal from the judgment, which initiated appeal No. B305549. Liang filed a notice of cross-appeal.

On July 17, 2020, the trial court filed a first amended judgment that also memorialized the trial court's ruling on BCP's motion for judgment, and therefore disposed of all causes of action among all parties. Li filed a second notice of appeal on August 21, 2020, initiating appeal No. B307349.

The parties moved this court for an order consolidating the two appeals. We granted the motion and consolidated the appeals for all purposes.

## DISCUSSION

Li argues that the trial court's judgment should be reversed on five grounds. First, he contends that the trial court erred when it imposed a constructive trust over his equity in Hollywood Garden. Second, he contends that the trial court should not have granted BCP's motion in limine regarding Lu's alleged Chinese government career and his financial condition. Third, he argues that the trial court erred when it quashed the notice to Lu to appear at trial. Fourth, he contends that the trial court erred when, as Li's briefing states, it determined that Betty Bai was unavailable as a witness. And fifth, Li contends that the trial court's exclusion of Terence Lai's emails was error.

On his cross appeal, Liang contends that the trial court erred by not awarding him *both* a constructive trust *and* the $2 million in lost profits that the jury had awarded.

12

## A.    Li's Appeal

### 1.    *Imposition of Constructive Trust*

Li contends that the trial court erred when it imposed a constructive trust over his equity in Hollywood Garden.  Citing *Communist Party v. 522 Valencia, Inc.* (1995) 35 Cal.App.4th 980, Li contends that our standard of review is de novo because, he explains, "[t]he issue of imposition of a constructive trust is a matter of law."  Liang, on the other hand, quoting *Hicks v. Clayton* (1977) 67 Cal.App.3d 251, 265, argues that "the propriety of granting equitable relief in a particular case by way of . . . a constructive trust[ ] generally rests upon the sound discretion of the trial court exercised in accord with the facts and circumstances of the case."

Li's reliance on *Communist Party v. 522 Valencia, Inc.*, *supra*, 35 Cal.App.4th 980 is misplaced.  That case did not articulate a standard of review, but rather determined that imposition of a constructive trust in the case was improper as a matter of law because the evidence in that case did not support any set of circumstances that would sustain the imposition of a constructive trust.  (*Id.* at pp. 993, 995.)

Contrary to Li's assertion, "[t]he propriety of granting equitable relief of imposition of a constructive trust rests within the sound discretion of the trial court."  (*GHK Associates v. Mayer Group, Inc.* (1990) 224 Cal.App.3d 856, 877-878.)

Regardless of the standard of review, Li has not demonstrated trial court error.

The primary thrust of Li's argument is that because Li's equity is essentially shares of a corporation, only the corporation itself has standing to pursue any remedy that involves transfer of the equity.  Li cites several cases that stand for the proposition

13

that a shareholder does not have standing (outside of a derivative action) to bring an action for injury to a corporation. (See, e.g., *Parmar v. Board of Equalization* (2011) 196 Cal.App.4th 705, 717; *PacLink Communications Internat., Inc. v. Superior Court* (2001) 90 Cal.App.4th 958, 964.)

However, Liang never sought in this action to assert a cause of action on behalf of Hollywood Garden. An action is derivative, " 'i.e., in the corporate right, if the gravamen of the complaint is injury to the corporation, or to the whole body of its stock and property without any severance or distribution among individual holders, or it seeks to recover assets for the corporation or to prevent the dissipation of its assets.' " (*PacLink Communications Internat., Inc. v. Superior Court*, *supra*, 90 Cal.App.4th at p. 964, italics omitted.) Liang's causes of action were not derivative; the gravamen of Liang's complaint was that Li made a number of misrepresentations to convince Liang to invest in a project and failed to do any of the things that induced Liang to invest. He also alleged and proved that Li's self-dealing conduct after Liang had invested harmed Liang directly. Liang's complaint alleged injury to Liang, *not* to Hollywood Garden. (See *Meister v. Mensinger* (2014) 230 Cal.App.4th 381, 386-387 [direct claim by preferred shareholders for breach of fiduciary duty by company's chief financial officer and chief executive officer arising from the company's sale of assets and subsequent dissolution]; *Jara v. Suprema Meats, Inc.* (2004) 121 Cal.App.4th 1238, 1258-1259 [concluding claim that two majority shareholders paid themselves excessive salaries, resulting in a decreased dividend for the plaintiff shareholder, was not required to be pursued as a derivative claim].)

14

Li has also argued that Hollywood Garden had already filed an action against him for corporate injury due to his conduct and this precluded Liang from obtaining a constructive trust over Li's share interest. This contention lacks merit. The derivative action filed by Hollywood Garden had been filed several months after Liang had filed his complaint, was deemed related to Liang's earlier filed case and thus was pending before the same trial judge who properly rejected Li's argument that Liang was precluded from the constructive trust remedy because it was a derivative claim.

In section B, *post,* we conclude that awarding Liang a constructive trust and the $2 million compensatory damages award does not overcompensate him. To the extent that the constructive trust remedy that Liang was awarded in the instant action (which we are affirming) may potentially impact the potential remedies available to the corporation in its later filed action, or create a risk that Liang could be "overcompensated," that is a matter Li can raise in the later-filed action, which is now on appeal, based on whatever showing Li may make based on the respective records in the two cases and our resolution of issues relating to the constructive trust in this opinion.

For similar reasons, we disagree with the dissent's assertion that affirming imposition of a constructive trust as a proper remedy in addition to the jury's $2 million award "may create even more problems than it purports to solve" because it is based not on "injury inflicted on Liang at all" but "injury to Hollywood Garden." (Dis. opn., p. 6.) Liang made a clear showing in the trial court that he suffered direct injury by the conduct of Li that led to the latter's unjust enrichment. As a

consequence, the trial court did not abuse its discretion in awarding Liang a constructive trust.

Li also argues that Liang is not entitled to a constructive trust as an equitable remedy because monetary damages could have completely compensated Liang for his injuries.  To support his argument, Li cites cases that stand for the general proposition that equitable relief is available absent an adequate remedy at law.  (See, e.g., *Morrison v. Land* (1915) 169 Cal. 580.)  Li cites no authority supporting that proposition in the specific context of the imposition of a constructive trust.  Indeed, "[i]n California, as in most jurisdictions, an action in equity to establish a constructive trust does not depend on the absence of an adequate legal remedy.  [Citation.]  A constructive trust is '[t]he usual theory' upon which a plaintiff recovers wrongfully acquired assets." (*Heckmann v. Ahmanson* (1985) 168 Cal.App.3d 119, 134.)  Here, when it found for Liang, the jury concluded that Li had wrongfully acquired his equity in Hollywood Garden.  The imposition of a constructive trust over those assets was an appropriate remedy to prevent Li's unjust enrichment.

The dissent concurs with the conclusion that the trial court did not err in granting a constructive trust to Liang but characterizes that decision as "in essence, an equitable lien on Li's assets (his shares in Hollywood Garden) in support of (or in lieu of) the jury's $2 million money judgment." (Dis. opn., p. 2.)  We disagree with this characterization of what the trial court did.  There is no reference in the record to the court imposing an equitable lien to satisfy the compensatory damages awarded by the jury.  Moreover, the case cited by the dissent, *County of Los Angeles v. Construction Laborers Trust Funds for Southern*

16

*California Admin. Co.* (2006) 137 Cal.App.4th 410, 416, footnote 5, acknowledges the distinction between an equitable lien and a constructive trust. As we have noted, the remedy that Liang sought leave to assert in order to redress Li's unjust enrichment was a constructive trust; that is also the remedy that was briefed by the parties after the jury verdict was rendered. There is nothing in that record, or in the judgment issued by the trial court, that references an equitable lien.

2. *Motion in Limine regarding Ying Wei Lu*

Li argues that the trial court erred when it granted BCP's motion in limine to exclude evidence regarding Lu's career and financial condition. Lu is the principal and manager of BCP, which purchased the Hollywood Garden loan from the original lender, and which in May 2018 declined Li's request to extend the loan term by another year. In his cross-complaint, Li alleged that BCP was "a front company, which was organized on behalf of, . . . controlled by, and beneficially owned by" Liang. Li contended that Liang was using BCP to foreclose on the 6140 Property and thereby deprive Li of the value of his equity in Hollywood Garden.

Li contends that "Lu's career as a Chinese government official and his financial condition is relevant because it is simply too implausible to believe that a former low-level Chinese government official would have the $4.9 million to purchase the [Hollywood Garden] loan . . . or the experience and knowledge necessary to establish a California corporation to do so." Li's brief here, consistent with his opposition to the motion in limine filed in the trial court, identifies no factual basis for the assertions.

17

To the contrary, the evidence BCP provided the court in support of its motion in limine establishes that Li's contentions were nothing more than speculation. At his deposition, and without any supporting factual basis, Li testified that Lu was "a government officer. I don't think he has $4 million in China, as a government officer, bring money to here just try to purchase a note and register the corporation one month before the note's mature." Li's speculation persisted: "I don't have any other evidence," he said, "[b]ut it's a general rule in China, any government officer cannot—impossible—has such amount of money, not matter how." When asked if he had "seen any documents that show that BCP is a [straw] corporation controlled by Liang," Li responded: "I didn't see any document, but the facts will be like this. Otherwise, it's ridiculous. It's nothing in logic."

Li argues that we should decide this question using a de novo standard of review "with all evidence viewed in light most favorable to Li," essentially because, he contends, this ruling was the equivalent of a nonsuit for BCP. We disagree. The appropriate standard of review under the circumstances is abuse of discretion. (*People v. Nakai* (2010) 183 Cal.App.4th 499, 516.)

Under any standard, however, we find no error in the trial court's ruling. BCP made its motion in limine under Evidence Code section 352, on the ground that any testimony offered about Lu's career or his financial condition would be unduly prejudicial. What the record affirmatively establishes, however, is that Li had no factual basis for the statements he was making about Lu. Moreover, even if there had been a factual basis for Lu's statements, it is entirely unclear how that evidence would have been relevant to any question the litigation actually presented. Other than Li's speculation about Lu's career and financial

18

condition, he has presented neither argument nor information that anyone else—much less anyone else with *actual personal knowledge*—would have testified about Lu's career or financial condition.

Finally, Li has not demonstrated how he was prejudiced in any way by the trial court's ruling. (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 573.) The trial court asked Li's counsel "how would Mr. Liang suggesting that Lu purchase[ ] the note be in any way tortious?" Li's only response was that Lu was holding the note for Liang. But the trial court had already concluded as a matter of *fact*, that "the uncontroverted evidence is that Liang . . . has no relation to BCP, has no economic interest in BCP. He has . . . no involvement in the formation of BCP, has no involvement in the purchase of the promissory note . . . . Liang has no control over BCP. He does not own shares in BCP. He has no financial ownership of BCP."

### 3.    *BCP's Motion to Quash*

In his briefing here, Li argues that the trial court abused its discretion when it granted BCP's motion to quash the subpoena directed at "Ying[ W]ei Lu as the person most qualified." Li contends that Lu was a California resident and that BCP's California articles of incorporation demonstrate that Lu was a California resident.

In support of his argument, Li provided the trial court with a copy of a BCP Statement of Information filed with the Secretary of State on April 6, 2018, that listed Lu as BCP's president, chief executive officer, secretary, chief financial officer, sole director, and agent for service of process, and provided an address in City of Industry, California. The company's Articles of Incorporation filed with the Secretary of State on March 13, 2018,

19

stated that Lu was the company's "initial agent for service of process," and gave the same City of Industry address as his address and the company's business and mailing address.

Lu, however, filed a declaration that stated that on July 29, 2019, he was "a citizen and a resident of the People's Republic of China," that he was "not currently a resident of the State of California and [does] not intend to make California [his] home," and that he has "not lived in California in the preceding twelve months." His declaration also stated that "BCP was incorporated in March 2018 and its initial Statement of Information was filed in April 2018. BCP inadvertently did not yet file an updated Statement of Information this year, but plans to do so."

The trial court concluded based on the evidence before it that Lu was a resident of China.

Code of Civil Procedure section 1989 states that "[a] witness . . . is not obliged to attend as a witness before any court, judge, justice or any other officer, unless the witness is a resident within the state *at the time of service*." (Italics added.)

There is no evidence in the record that Lu was a resident of the State of California on July 10, 2019.[5] The trial court did not err when it granted the motion to quash.

4.      *Betty Bai's Availability to Testify*

Li next contends that the trial court erred when it concluded that Betty Bai was unavailable to testify as a witness at trial.

---

[5] The notice to appear is dated July 10, 2019, but the copy of the notice in the appellant's appendix does not include a proof of service. Presumably, the notice was served on either BCP or Lu, if at all, at some point in 2019.

20

We observe, however, that the trial court never made a determination that Betty Bai was unavailable to testify. Rather, the trial court concluded pursuant to Code of Civil Procedure section 2025.620 that Betty Bai's deposition testimony could be shown to the jury.

Code of Civil Procedure section 2025.620 states that "[a]t the trial or any other hearing in the action, any part or all of a deposition may be used against any party who was present or represented at the taking of the deposition, or who had due notice of the deposition and did not serve a valid objection under Section 2025.410, so far as admissible under the rules of evidence applied as though the deponent were then present and testifying as a witness . . . ." Subdivision (c)(2)(E) states that "[a]ny party may use for any purpose the deposition of any person . . . , including that of any party to the action, if the court finds . . . [¶] . . . [¶] . . . [that t]he deponent, without the procurement or wrongdoing of the proponent of the deposition for the purpose of preventing testimony in open court, is . . . [¶] . . . [¶] . . . [a]bsent from the trial or other hearing and the proponent of the deposition has exercised reasonable diligence but has been unable to procure the deponent's attendance by the court's process."

When Liang sought to have Betty Bai's deposition testimony presented to the jury, the trial court inquired whether Liang had subpoenaed Betty Bai to appear and whether there was a proof of service. Concluding that Liang had subpoenaed Betty Bai, that there was a proof of service, and that Betty Bai had not appeared, the trial court allowed Betty Bai's deposition testimony to be presented to the jury in lieu of live testimony.

In his reply brief, Li continues to assert that the trial court's decision was based on Betty Bai's *unavailability*. If we

21

extend his argument to Code of Civil Procedure section 2025.620, he *essentially* contends that we should limit the application of section 2025.620 to cases where a witness is unavailable to testify.  To do so, however, would require us to ignore that the Legislature expressly provided for unavailability of a witness in other subdivisions of section 2025.620.  A party may use a deposition, for example, if the trial court finds that the witness is "[d]ead or unable to attend or testify because of existing physical or mental illness or infirmity" (Code Civ. Proc., § 2025.620, subd. (c)(2)(C)), or "[a]bsent from the trial or other hearing and the court is unable to compel the deponent's attendance by its process" (Code Civ. Proc., § 2025.620, subd. (c)(2)(D)).  We decline Li's invitation to read language into the statute that does not appear there, and to read other language in the statute as surplusage.

More to the point, however, we note that Li's unavailability argument and Code of Civil Procedure section 2025.620 are two independent analyses for a determination of whether to allow a party to use deposition testimony at trial.  (See *Berroteran v. Superior Court* (2022) 12 Cal.5th 867, 902 [referring to Code Civ. Proc., § 2025.620 as "a statutory rule . . . [that] explicitly allows parties to use depositions as substantive evidence at the subsequent trial between the same parties, regardless of witness availability"].)

There were *two independent analyses* under which the trial court could have made its determination and Li has not addressed one of those independent analyses at all.  Li's failure to address the trial court's actual analysis and basis for admitting Betty Bai's deposition testimony renders any asserted error

22

harmless. (See *Chan v. Drexel Burnham Lambert, Inc.* (1986) 178 Cal.App.3d 632, 645, fn. 6.)

5.	*Terence Lai Emails*

Li contends that the trial court abused its discretion when it sustained objections to the introduction of emails between a gentleman named Terence Lai and several other individuals. Li's theory is that Liang "penetrated Li's offices and caused Terence Lai to act behind Li's back." Although Li's brief does not clearly articulate the argument, Li appears to contend that Lai's actions were part of Liang's breach of some fiduciary duty that Liang purportedly owed to Hollywood Garden as a shareholder. One of the emails purports to be an introduction to the owner of the Hollywood Garden loan, identifying Lai as a "manager" who "just joined [Li's] group" and wanted to work with the loan's owner regarding extending the loan term in April 2017. The remaining emails appear to have been exchanged in March and April 2018, and appear to represent communications between Lai and various individuals facilitating BCP's purchase of the Hollywood Garden loan. Other than Li, who does not appear to have sent or received any of the emails, no person whose name appears anywhere in any of the emails was a witness.

Liang objected to introduction of the emails as hearsay. " 'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated. [¶] . . . Except as provided by law, hearsay evidence is inadmissible." (Evid. Code, § 1200, subds. (a), (b).)

Li argued that the emails were being offered not for the truth of their contents, but rather to demonstrate the fact that Liang had "penetrated [Li's] offices and converted Terence Lai."

23

Li's argument is that "Lai, while he was employed by Hollywood Garden, was coordinating a purchase of the [$4 million loan] by BCP." According to Li, the emails were not being offered for the truth of their contents, but rather to show this *act*. "A statement not offered for its truth is, definitionally, not hearsay." (*People v. Superior Court* (*Couthren*) (2019) 41 Cal.App.5th 1001, 1019.)

We disagree with Li's contention.

The basic flaw with Li's argument is that according to Li's brief, the documents are *expressly* being offered for the truth of their contents. Indeed, if the statements in the emails are *not* true, then the emails are *not relevant* (and therefore inadmissible as irrelevant).

Li's argument regarding the emails' admissibility depends on Lai being either Li's employee or Hollywood Garden's employee. The first of the emails purports to establish, according to Li, that Lai "had just joined Li as a manager." Another purports to show that "Lai, while he was employed by Hollywood Garden, was coordinating a purchase of the [$4 million loan] by BCP."

The court entertained argument regarding whether the emails were inadmissible hearsay, and explained to Li that the basis of the ruling was that the court had "no idea" who the people were that sent and received the emails, and had "no idea . . . whether any of it's true." The trial court explained that Li could "bring in someone who can testify" about the contents of the documents if he wanted the emails admitted: "You're going to have to bring in Mr. Lai, and you're going to have to question him or these documents don't come in. . . . Obviously, if you bring in other witnesses, you'll be able to question them."

Moreover, and directly to the heart of Li's argument, the documents do not independently support Li's contention regarding Lai or his employment or participation at any point. At best, the emails suggest that Li was Lai's employer (if the contents of the documents are to be believed) in April 2017 and that *a year later*, Lai was involved in the transfer of the Hollywood Garden loan from the original lender to BCP. But again, *even that basic connection turns on the truth of the contents of the documents*.

## B. Liang's Cross-appeal

On cross-appeal, Liang contends that the trial court erred when it omitted the $2 million compensatory damages award from the judgment. Liang contends he was entitled to both the constructive trust and the compensatory damages. We agree.

We review a trial court's decision concerning the measure of damages for abuse of discretion.[6] (*GHK Associates v. Mayer Group, Inc.*, *supra*, 224 Cal.App.3d at p. 873; see *New West Charter Middle School v. Los Angeles Unified School Dist.* (2010) 187 Cal.App.4th 831, 843 ["The trial court's choice among several legally permissible measures of damages, under the specific

---

[6] Liang argues that we should review the trial court's decision to omit the compensatory damages award de novo, because "[w]hether a plaintiff 'is entitled to a particular measure of damages is a question of law subject to de novo review.'" (*Rony v. Costa* (2012) 210 Cal.App.4th 746, 753, quoting *Toscano v. Greene Music* (2004) 124 Cal.App.4th 685, 691.) The issue, however, is not whether Liang's lost profits is a proper measure of compensatory damages, but whether he is entitled to those damages and the constructive trust the trial court imposed on Li's interest in Hollywood Garden.

circumstances of the case, is a matter of discretion"].) " 'The scope of discretion always resides in the particular law being applied; action that transgresses the confines of the applicable principles of law is outside the scope of discretion and [the reviewing court] call[s] such action an abuse of discretion.' [Citation.]" (*Pacific Gas & Electric Co. v. Superior Court* (2006) 144 Cal.App.4th 19, 23.)

We have already rejected Li's evidentiary challenges to the jury's verdict, as well as his challenges to the court's imposition of a constructive trust. Thus, unless there is some reason why Liang cannot obtain both the compensatory damages awarded by the jury and the constructive trust imposed by the court, then the trial court erred in omitting the compensatory damages award from the judgment.

We first discuss the arguments Li makes in opposition to Liang's appeal. Then we address the trial court's apparent concerns about a potential double recovery or need to elect remedies. We conclude none of these arguments or concerns has merit, and that the trial court erred in not including the compensatory damages award in the judgment.

1.    *Li's Arguments in Opposition to Liang's Appeal Are Unavailing*

In his briefing on Liang's cross-appeal, Li makes three arguments why Liang is not entitled to the compensatory damages award and the constructive trust.

First, Li argues that we should reverse the $2 million compensatory damages award because of the evidentiary issues he raised in his appeal. In disposing of Li's appeal, *ante,* we have rejected all of Li's evidentiary challenges.

26

Second, Li contends the trial court granted Liang's motion to add the constructive trust remedy after the close of evidence, which prejudiced him because "the claims against him were unknown throughout trial." This argument fails because, as we noted, *ante*, the trial court granted the motion to add the constructive trust remedy on August 12, 2019, a week before trial commenced. Furthermore, Li was on notice when Liang filed the motion on August 8, 2019, that Liang would be seeking a constructive trust remedy. In any event, Li fails to demonstrate any prejudice, for example, what additional evidence he would have proffered, or how his strategy would have been different. Nor does he cite any portions of the record. Indeed, it appears that Li actually sought to take advantage of the prospect that his shares would be subjected to a constructive trust, when he testified in the punitive damages phase of trial that, "I surrender all my share. Surrender all my share. Get over this case. I just walk away. Done. Done. I have nothing to do with this case. I just want to say that." It is not our job "to comb the record looking for the evidence or absence of evidence to support [a party's] argument.' " (*Becerra v. McClatchy Co.* (2021) 69 Cal.App.5th 913, 953, quoting *People ex rel. Reisig v. Acuna* (2010) 182 Cal.App.4th 866, 879.)

Third, Li argues that the constructive trust is improper because it was imposed on shares of Hollywood Garden and, therefore, only Hollywood Garden itself has standing to sue. As set forth earlier in our discussion regarding Li's appeal, we reject this argument.

In sum, none of Li's arguments is availing.

27

2.    *There Will Be No Double Recovery or Conflicting Remedies*

Although the record is opaque as to why the trial court ultimately decided to omit the compensatory damages award from the judgment, it is apparent that the court was concerned about a double recovery or possibly that Liang had to make an election of remedies.  We conclude that these concerns are not well-founded.

a.    *The Damages Award and Constructive Trust Remedy Address Different Wrongs and Injuries to Liang and Thus Do Not Constitute Double Recovery*

In *Tavaglione v. Billings* (1993) 4 Cal.4th 1150, 1158-1159 (*Tavaglione)* our high court set forth the applicable principles: "Regardless of the nature or number of legal theories advanced by the plaintiff, he is not entitled to more than a single recovery for each distinct item of compensable damage supported by the evidence.  [Citation.]  Double or duplicative recovery for the same items of damage amounts to overcompensation and is therefore prohibited.  [Citation.]  [¶] . . . [¶]  In contrast, where separate items of compensable damage are shown by distinct and independent evidence, the plaintiff is entitled to recover the entire amount of his damages, whether that amount is expressed by the jury in a single verdict or multiple verdicts referring to different claims or legal theories."

Although *Tavaglione* involved compensatory damage awards rendered by the jury on two different causes of action, the basic prohibition against double or duplicative recovery applies when a plaintiff is seeking compensatory damages and equitable

28

relief.[7]  (See *Spaulding v. Cameron* (1952) 38 Cal.2d 265, 269 [holding the plaintiff in a nuisance action could not obtain compensation for depreciation in the value of her property caused by the nuisance and also an injunction against the nuisance, because that would amount to a "double recovery"].)

In contrast, here the jury's compensatory damages award and the court's constructive trust are remedies for separate injuries and are based on "distinct and independent evidence." (*Tavaglione, supra,* 4 Cal.4th at p. 1159; see *Michelson v. Hamada* (1994) 29 Cal.App.4th 1566, 1583-1585 [analyzing evidence of damages to conclude that a jury's award of damages

---

[7] The parties are in agreement that, in the instant case, the constructive trust sought by Liang was an equitable remedy. Although there are circumstances where a constructive trust is made statutorily available (Civ. Code, §§ 2223, 2224), a constructive trust is generally regarded as an equitable remedy particularly when it is used as a means to address unjust enrichment.  (See *Martin v. Kehl* (1983) 145 Cal.App.3d 228, 237, 238 ["In order to provide the necessary flexibility to apply an equitable doctrine to individual cases, [Civ. Code, §§ 2223 & 2224] state general principles for a court's guidance rather than restrictive rules"; affirming the imposition of a constructive trust based on an alleged oral promise]; *Calistoga Civic Club v. City of Calistoga* (1983) 143 Cal.App.3d 111, 116 ["All that must be shown [to justify the imposition of a constructive trust] is that the acquisition of the property was wrongful and that the keeping of the property by the defendant would constitute unjust enrichment"]; *Kraus v. Willow Park Public Golf Course* (1977) 73 Cal.App.3d 354, 373 ["A constructive trust is a remedial device primarily created to prevent unjust enrichment; equity compels the restoration to another of property to which the holder thereof is not justly entitled"].)

for breach of contract was separate from its award of damages for fraud and breach of fiduciary duty]; *Pat Rose Associates v. Coombe* (1990) 225 Cal.App.3d 9, 19-20 [analyzing the components of separate damage awards to conclude the plaintiff was properly awarded non-duplicative lost profits and out-of-pocket losses], disapproved on another ground in *Adams v. Murakami* (1991) 54 Cal.3d 105, 116.)

The jury's $2 million damages award compensated Liang for his lost return up to the time of trial on the $5.48 million he invested in the project.[8]  Liang's theory was that he would not have invested in the project had he known that Li had not made, and was not going to make, the contributions Li promised in the agreement the parties signed on March 25, 2016.[9]  Liang's expert Luke Goetz calculated Liang's lost return at $2.1 million from the date Liang contributed the money in March of 2016 through August 19, 2019, when trial commenced, assuming a 10 percent annual return on investment.  Goetz also calculated Liang's lost return at a 10 percent annual rate of return for two years into the future to be $1.53 million, for a total loss of approximately $3.6 million from March of 2016 through two years after trial.  Alternatively, assuming an 8 percent return on investment

---

[8] Li acknowledges that the $2 million in compensatory damages awarded by the jury is for Liang's lost profits.

[9] Liang's first cause of action for fraud was based on the allegation Li falsely told Liang that he (Li) had already contributed money to Hollywood Garden and would contribute more, and that all that was needed to cover the purchase price of the 6140 Property was $5.48 million.  Liang alleged that, had he known the true facts, he would not have invested in Hollywood Garden.

(which is the "minimum" return on investment Liang was to receive under the agreement), Goetz calculated lost profits of $2.7 million for the longer period, i.e., from when Liang made his contribution in March of 2016 to two years after trial. In his closing argument, Liang's counsel told the jury Goetz's calculations showed, assuming a 10 percent rate of return, that Liang had lost $2.1 million up to the start of trial (March 28, 2016, through August 19, 2019) and the loss would increase to $3,630,181 by adding the two years it would take to be in a position where the property could be sold. Given that the jury's award ($2 million) is very close to the amount that Goetz calculated was Liang's lost return on his investment through trial assuming a 10 percent annual rate of return on investment ($2.1 million), it is evident that the jury's award was compensation for Liang's lost return on his investment *through trial*.

In contrast, the trial court imposed the constructive trust, and properly so, to remedy the injury to Liang that persisted with respect to the parties' interests in Hollywood Garden *after trial*.[10] More specifically, Liang sought the constructive trust because despite Li's misconduct, he would still hold a 40.3 percent stake in Hollywood Garden were such a trust not imposed. Absent imposition of a constructive trust on Li's interest in Hollywood Garden, Li would be unjustly enriched because his actual monetary contributions to the venture were, at best, a small fraction of the amounts he promised in the March 25, 2016,

---

[10] The trial court imposed the constructive trust in favor of Liang and against Li "on all assets and equity in Hollywood Garden, LLC acquired by [Li]" and indicated that this remedy "is intended to prevent the unjust enrichment of [Li]."

31

agreement, and he also withdrew money from Hollywood Garden's account for expenses unrelated to the venture.

In addition, actions taken by Li after Liang made his $5.48 million contribution had the effect of preventing Liang from withdrawing his $5.48 million contribution to the purchase of the 6140 Property and to Hollywood Garden, and subjecting Liang's investment to terms benefitting only Li and harming Liang. Li's actions also conflicted with the parties' basic understanding that the purchase would be completed with Li's and Liang's respective capital investment without debt financing.

More specifically, Li used $4.8 million *of Liang's* contribution to pay two non-refundable deposits on the property, and then obtained a $4 million hard money loan secured solely by the 6140 Property, with no personal guaranty by Li. As a result of the non-refundable deposits, most of Liang's $5.48 million investment would have been lost if Hollywood Garden had withdrawn from the transaction. As a result of the loan, which had to be paid off in, at most, two years and gave the lender a right to foreclose upon default, and the lack of any substantial funds in Hollywood Garden's account to pay off the loan, Liang would either have to pay off the loan quickly or risk foreclosure, which would jeopardize at least a portion of the money already invested in the 6140 Property.

Thus, Li's fraudulent actions in consummating the purchase of the 6140 Property made it impossible for Liang to get out of the project by simply withdrawing his contribution.[11] As

---

[11] There does not appear to be any dispute that the vast majority of the money Hollywood Garden used to purchase the 6140 Property came from two sources, namely, Liang's $5.48

Liang argues on appeal, "Liang's investment remains tied up in Hollywood Garden. Liang's only means of avoiding foreclosure and losing his investment in its entirety is to plow more money in. He cannot do so, when Li stands to gain 40.3 [percent] of every additional dollar Liang puts in." Under these circumstances, the trial court properly imposed a constructive trust to remedy Li's fraud, breaches of fiduciary duty and breach of contract, and prevent him from being unjustly enriched by holding a 40.3 percent stake in Hollywood Garden despite the fact that Liang contributed almost all of the capital used to obtain the 6140 Property.

In sum, the jury's award of $2 million in damages compensated Liang for the loss of his return on investment up through trial, and the trial court's constructive trust remedied the different harm were Li to keep his 40.3 percent stake in Hollywood Garden. Accordingly, awarding both remedies would not have resulted in double or duplicative recovery for Liang.

In addition, these different remedies rely on distinct and independent sets of evidence. Granted, the wrongs addressed by both remedies are Li's fraud in misrepresenting that he had contributed $1.3 million to Hollywood Garden, and in promising that he would contribute an additional $4.7 million to the venture. The constructive trust remedy is based on the additional evidence of the actions Li took in consummating the purchase of the 6140 Property, which effectively precluded Liang from seeking to extricate his contribution from Hollywood Garden. (See *Denevi v. LGCC, LLC* (2004) 121 Cal.App.4th 1211,

million contribution and the $4 million loan Li obtained in Hollywood Garden's name.

1219 [noting that had the plaintiff discovered the fraudulent inducement "immediately, he could have sued immediately, and would have been entitled at least to rescind the transaction and recover the rights thus conveyed"].)

Li has not, either below or on appeal, marshalled any evidence or fact-based argument that would support a finding that, by awarding Liang a constructive trust over Li's 40.3 percent interest in Hollywood Garden, in addition to the $2 million award for lost profits, Liang would be receiving a windfall due to any significant appreciation of the 6140 Property since it was acquired for $9.5 million. Our own review of the record persuades us that any such argument, had it been made, would lack merit.

Li did testify at trial that there was a competing offer of $11 million when he secured the property for Hollywood Garden. However, this statement is, at best, inadmissible hearsay (it implies that someone told him that another offer had been made or he saw in a document that was not before the court that such an offer was made). It is also of extremely dubious reliability given that the seller elected not to accept the purported competing offer and instead entered into the purchase agreement with Li to sell the property for $9.5 million. We similarly disregard the unverified allegation in Li's December 2018 cross-complaint that on information and belief the property had a "current value . . . over $12 million." Finally, Li did assert in a loan application to Macoy Capital, submitted in September 2018 (more than a year after he was removed as manager of Hollywood Garden) that he estimated the value of the 6140 Property to be $13 million. But this too is hearsay (it is Li's out-of-court statement offered for its truth) and there is no indication that the

34

prospective lender ever confirmed the reliability of Li's estimate. It also appears that the loan Li was seeking was not approved. In fact, the credibility of the entire loan application has been called into question by Li himself during the trial. The loan application included representations regarding Li's personal assets, including that he owned stocks and bonds worth $14 million and notes receivable worth $14,810,000. When Li was confronted with these statements on cross-examination during the punitive damages phase of the trial, he said the information was "not accurate" and that it was prepared by his bookkeeper/accountant. It was also in the midst of this cross-examination into whether statements in the application about his assets were false that Li interjected "I surrender all my share [*sic*]." He never did respond to the question of whether his loan application statements were false.

Thus, the only reliable evidence in the record on the value of the 6140 Property was the purchase price itself. As a consequence, the evidence demonstrated that the value of Li's 40.3 percent interest in Hollywood Garden, given that the sole asset was a property purchased for $9.5 million subject to a $4 million loan, was (at least on paper) about $2 million. Considering the $2 million compensatory damage award and the constructive trust over Li's shares in Hollywood Garden, Liang was awarded a total of approximately $4 million, half of which was for the lost profits up to the time of trial. This is substantially less than his investment of $5.48 million, and he was still faced with having to invest additional funds to develop the property before it could generate any profit. "In measuring the amount of the defendant's unjust enrichment, the plaintiff may present evidence of the total or gross amount of the benefit,

35

or a reasonable approximation thereof, and then the defendant may present evidence of costs, expenses, and other deductions to show the actual or net benefit the defendant received.  'The party seeking disgorgement "has the burden of producing evidence permitting at least a reasonable approximation of the amount of the wrongful gain," ' and the ' "[r]esidual risk of uncertainty in calculating net profit is assigned to the wrongdoer." '  [Citation.]" (*Meister v. Mensinger, supra,* 230 Cal.App.4th at p. 399.)  Application of these principles here supports our conclusion that Liang met his burden of demonstrating that the constructive trust over Li's shares was proper as an additional remedy to the $2 million jury award, necessary to prevent unjust enrichment, and also that any uncertainty about the precise economic benefits flowing to Liang from the two remedies was something Li was required to demonstrate.  He failed to do so.

b.      *Election of Remedies*

The doctrine of election of remedies is related to the concept of double or duplicative recovery.  "Broadly speaking, election of remedies is the act of choosing between two or more concurrent but inconsistent remedies based upon the same state of facts." (*Roam v. Koop* (1974) 41 Cal.App.3d 1035, 1039.)  "In its 'conventional form,' the doctrine of election of remedies 'is stated as follows:  Where a person has two concurrent remedies to obtain relief *on the same state of facts*, and *these remedies are inconsistent*, he must choose or elect between them; and if he has clearly elected to proceed on one, he is bound by this election and cannot thereafter pursue the other.  "Election of remedies has been defined to be the right to choose or the act of choosing between different actions or remedies where [the] plaintiff has suffered *one species of wrong* from the act complained of.  Broadly

36

speaking, an election of remedies is the choice by a plaintiff to an action of one of two or more coexisting remedial rights, where several such rights arise out of the same facts, but the term has been generally limited to a choice by a party between *inconsistent* remedial rights, the assertion of one being *necessarily repugnant to* or a *repudiation of* the other." [Citation.]' (3 Witkin, Cal. Procedure[ (4th ed. 1997) Actions], § 174, pp. 243-244; italics added.)" (*Denevi v. LGCC, LLC*, *supra*, 121 Cal.App.4th at p. 1218.) "One limitation on the doctrine . . . is the requirement that the plaintiff seek inconsistent remedies in causes of action based on the same set of facts." (*Baker v. Superior Court* (1983) 150 Cal.App.3d 140, 145.) "Courts and commentators have long recognized the harshness of the election of remedies doctrine and have for some time looked upon it with disfavor. [Citations.]" (*Ibid.*)

To the extent the trial court forced Liang to elect between two remedies—the jury's $2 million compensatory damages award and the constructive trust—it erred. As discussed above, the jury's award compensated Liang for the loss of his return on investment through trial. In contrast, the court's constructive trust remedied the unjust enrichment that would occur if Li were allowed to retain his 40.3 percent stake in Hollywood Garden given (1) Li contributed only a small fraction of what he promised to contribute; and (2) Li burdened Liang's contribution by using it to make $4.8 million in non-refundable deposits and encumbering the property with a $4 million loan that essentially has required Liang to invest more funds to avoid having his existing investment dissipated. These two remedies are not " ' "*inconsistent*," ' " nor would " ' "the assertion of one be[ ]

37

*necessarily repugnant to* or a *repudiation of* the other." ' " (*Denevi v. LGCC, LLC, supra*, 121 Cal.App.4th at p. 1218.)

In conclusion, the trial court's omission of the jury's $2 million compensatory damages award from the judgment to avoid duplicative damages or to force an election of remedies was error.

The dissent characterizes this conclusion as an improper "reformation" of the jury verdict. Although the jury did find for Liang on all the causes of action that were presented to it, including breach of contract, fraud and breach of fiduciary duty, and it awarded damages on each of these claims in the same amount ($2 million), this was a very close approximation of the amount that Liang's evidence, including expert testimony, demonstrated to be his lost investment profits due to Li's conduct. The jury was not presented with an opportunity to make an award for any amount to address Li's significant unjust enrichment and properly so; that was an issue for the trial court to address for all the reasons discussed, *ante*. For this reason, the dissent's argument predicated on *Tavaglione*, *supra*, 4 Cal.4th at page 1158, is inapt.

On the record before us, there is no basis to conclude that the harm remedied by the compensatory damages verdict and constructive trust were the same, or even overlapped. Nor was there evidence that would support a finding that granting Liang both remedies results in a windfall. The dissent does not address Li's unjust enrichment at all, even though that was the focus of Liang's argument for amending his complaint to assert the remedy, and also was the centerpiece of his post-verdict argument for the issuance of the constructive trust. As we discussed, *ante,* the possibility that, depending upon the outcome of the later-filed derivative case, Liang *may,* in some manner be

38

overcompensated, would only occur if the trial judge in that case, who is the same trial judge in this case, were to ignore the outcome here. That speculative possibility does not require us to disregard the fact that, in the present case, Liang was denied remedies to which he was entitled.

Although the dissent focuses on a speculative windfall to Liang, our conclusion in this case avoids, not a speculative windfall, but a certain one in favor of Li, i.e., the windfall that Li would enjoy if he could use assets to which he had no right (his shares in Hollywood Garden) to satisfy the liability to Liang imposed by the jury in the manner the dissent suggests. Accordingly, we cannot agree with the dissent's conclusion that Liang could not be awarded both remedies.

## DISPOSITION

The judgment as to all the issues raised in Li's appeal is affirmed.  The judgment is reversed as to the issues in Liang's cross-appeal and the trial court is directed to issue a new judgment reinstating the jury's $2 million compensatory damages award and imposing a constructive trust on Li's interest in Hollywood Garden in accordance with the guidance in this opinion.

NOT TO BE PUBLISHED


KELLEY, J.*


I concur:


BENDIX, Acting P. J.

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

CHANEY, J., Concurring and dissenting.

The trial court acted within its discretion when it imposed a constructive trust on Ji Li's shares of Hollywood Garden LLC in favor of Kai Hou Liang. The trial court did not err when it granted BCP's motion in limine to exclude evidence regarding Ying Wei Lu's career and financial condition, when it granted BCP's motion to quash the subpoena directed at Lu, when it allowed Betty Bai's deposition testimony to be presented to the jury, or when it sustained objections to the introduction of emails between Terence Lai and others. Because I would find no error in the bases Li asserts on his appeal, I concur with my colleagues regarding the issues on Li's appeal.

I would also affirm the trial court's judgment as it relates to Liang's cross-appeal.

Liang argues on cross-appeal that he was entitled to both the constructive trust that the trial court imposed and the $2 million in compensatory damages that the jury awarded. I would conclude that Liang has not met his burden on appeal to demonstrate that the trial court abused its discretion by refusing to award him *both* forms of relief where the jury made a single, indivisible, $2 million award.

The trial court denied Liang's motion to bifurcate, and granted motions to dismiss every equitable cause of action in the case before every cause of action remaining in the lawsuit—Liang's causes of action for fraud, breach of fiduciary duty, and breach of contract—were presented to the jury. The jury was presented a binary choice on each of Liang's three causes of action: "We find in favor of Kai Hou Liang and against Ji Li;" or "We find in favor of Ji Li and against Kai Hou Liang." If the jury found in favor of Liang on "*any*" of the three causes of action, it

was to answer the question "What are Kai Hou Liang's Damages?" with a single number; the jury concluded that Liang had been damaged *for one or all of the causes of action together* in the amount of $2 million.

Besides concluding that Li "acted with malice, oppression[,] or fraud," the jury did not make any other factual findings related to the causes of action or any theory of recovery any party presented at trial.

To find that the trial court abused its discretion here would require us to conclude that Liang had established on this appeal (and in the trial court) that he was entitled as a matter of law to both a constructive trust *plus* $2 million.

The crux of the problem with Liang's argument, however, is that there was no cause of action for constructive trust in this case. The constructive trust here was imposed pursuant to Liang's request that a constructive trust be imposed as a *remedy* based on the same three causes of action that the jury heard.

It appears that the trial court acted within its discretion when it imposed a constructive trust as, in essence, an equitable lien on Li's assets (his shares in Hollywood Garden) in support of (or in lieu of) the jury's $2 million money judgment. (*County of Los Angeles v. Construction Laborers Trust Funds for Southern California Admin. Co.* (2006) 137 Cal.App.4th 410, 416, fn. 5.) But I find no authority to support a reformation of the jury's verdict to award *both* a $2 million money judgment *and* to take an asset worth millions of dollars away from Li and hand it over to Liang where the jury has made no independent findings that would support that additional transfer of either money or property between the parties.

2

Apart from those principles, what Liang actually argued here is no more helpful for his cause.

Liang contends that the jury found in his favor on three causes of action—fraud, breach of contract, and breach of fiduciary duty. Liang explains that the $2 million compensatory damage award "represented the lost return on his $5.48 million investment pursuant to the [contract] as a result of Li's breach . . . ." Liang contends that he "thereafter also sought equitable relief from the trial court as a remedy for the breach of fiduciary [duty] and fraud causes of action on the grounds Li's fraudulent activities resulted in his unjust enrichment (in the form of a 40.3 percent interest in Hollywood Garden . . .)."

Liang accurately points out that " '[r]egardless of the nature or number of legal theories advanced by the plaintiff, he is not entitled to more than a single recovery for each distinct item of compensable damage supported by the evidence.' " (Quoting *Tavaglione v. Billings* (1993) 4 Cal.4th 1150, 1158 (*Billings*).) "Double or duplicative recovery for the same items of damage amounts to overcompensation and is therefore prohibited." (*Id.* at p. 1159.)

"In contrast, where separate items of compensable damage are shown by distinct and independent evidence, the plaintiff is entitled to recover the entire amount of his damages, whether that amount is expressed by the jury in a single verdict or multiple verdicts referring to different claims or legal theories." (*Billings*, *supra*, 4 Cal.4th at p. 1159.)

In *Billings*, our Supreme Court considered "the interplay between [a] jury's responses to special interrogatories, disclosing the amount of damages attributable to plaintiff's various theories of recovery, and the jury's general verdict, setting forth the total

3

amount of damages awarded to plaintiff. . . .  [P]laintiff sued defendants on several different causes of action, including defamation.  The jury's general verdict awarded plaintiff approximately $2.25 million in compensatory damages, but the jury's responses to special interrogatories disclosed it found plaintiff's damages *on the defamation count* were only $604,787; damages on plaintiff's other theories accounted for the difference.  The jury also awarded plaintiff $2.4 million in punitive damages." (*Billings*, *supra*, 4 Cal.4th at p. 1152.)

Liang also relies heavily on *Michelson v. Hamada* (1994) 29 Cal.App.4th 1566 (*Michelson*).  In that case, Michelson "filed a complaint alleging breach of contract, breach of fiduciary duty, and fraud, among other causes of action.  By special verdict, the jury found in favor of Michelson.  The jury awarded damages of $140,000 for breach of contract, $500,000 for breach of fiduciary duty, and $500,000 for fraud.  The jury further found that compound prejudgment interest should be assessed.  In a separate phase of the trial, the jury awarded $1,250,000 in punitive damages.  [¶]  After discharging the jury, the trial court ordered a total of $500,000 in actual damages . . . ."  (*Id.* at pp. 1574-1575.)

In each of those cases, based on special verdicts that specifically delineated amounts of compensatory damages attributable to specific causes of action, the reviewing court determined that an appropriate analysis of compensatory damages had to account for amounts the jury attributed to each cause of action so long as those damages were not based on identical conduct.  (*Billings*, *supra*, 4 Cal.4th at p. 1157; *Michelson*, *supra*, 29 Cal.App.4th at pp. 1582-1583.)

4

The jury's verdict here *does not establish a distinct amount of damages attributable to each cause of action*—something that Liang *could* have requested, but *did not*. (See *English v. Lin* (1994) 26 Cal.App.4th 1358, 1369 [jury verdict affirmed where plaintiff failed to request a verdict form segregating elements of damages].) "At bottom, the determination of damages is essentially a factual matter on which inevitable differences of opinion do not warrant intervention by the appellate courts." (*Heiner v. Kmart Corp.* (2000) 84 Cal.App.4th 335, 347.)

In contrast to the awards in *Billings* and *Michelson*, there is no way to read the jury's verdict here as establishing a compensatory damage award for any specific cause of action as distinguished from another. Indeed, the jury would have been empowered to award whatever it decided as a measure of damages for *any one* of the three causes of action. It is *not*, therefore, a reasonable interpretation of the jury's verdict that it intended a $2 million compensatory damage award to compensate *only* for breach of contract.

Moreover, it is clear that the trial court viewed a constructive trust or a compensatory damage award as an either/or proposition. Although the record contains no reporter's transcript from the status conference at which the constructive trust issue was apparently discussed, the trial court alluded to the issue during discussions with counsel before the jury returned its verdict. In a colloquy with counsel regarding another amendment to the complaint, the trial court noted that it had spoken with counsel "off the record yesterday that there can't be double recovery . . . there may have to be a choice of remedies."

It appears from the record that the trial court viewed a constructive trust *and* a compensatory damage award as

5

duplicative. Consequently, after the status conference at which those issues appear to have been discussed, *Liang* submitted a proposed judgment and an alternative proposed judgment. The proposed judgment contained *both* a compensatory damage award in the amount of $2 million *and* a constructive trust. The proposed alternative judgment *omitted* the compensatory damage award and opted only to impose a constructive trust.

"The trial court's choice among several legally-permissible measures of damages, under the specific circumstances of the case, is a matter of discretion." (*New West Charter Middle School v. Los Angeles Unified School Dist.* (2010) 187 Cal.App.4th 831, 843.) Here, at Liang's urging, the trial court imposed a constructive trust, choosing to satisfy Liang's compensatory damage award by placing Li's substantial equity in Hollywood Garden in a constructive trust and transferring it to Liang.

I can find no support in either the record or at law for Liang's implicit assertion that he has established here that he was entitled as a matter of law to what appears to me to be a reformation of the jury's verdict of millions of dollars in Liang's favor.

Finally, I would note that reforming the jury's verdict may create even more problems than it purports to solve. The "separate injury" reformation of the jury verdict and judgment seeks to remedy is not injury inflicted on Liang at all; it was injury to Hollywood Garden. The argument is, at base, that the constructive trust was *not* to function as essentially an equitable lien—a means of collecting on a $2 million money judgment—but rather was intended to separately compensate Liang for Li's use of Liang's investment in Hollywood Garden to acquire a $4 million hard money loan (in Hollywood Garden's name) secured

6

by the 6140 Property (which was in Hollywood Garden's name). The fundamental flaw with the argument, however, is that the money Li used to acquire the loan no longer belonged to Liang when Li used it to acquire the loan; it belonged to Hollywood Garden. Liang had already received shares in Hollywood Garden in return for his investment. So while Liang could recover damages for Li's fraud, breach of contract, and breach of fiduciary duty against him, he was in no position to recover for injuries Li caused to Hollywood Garden.

Indeed, in a separate lawsuit against Li that is currently on appeal, Hollywood Garden sought to recover from Li the amounts he incurred on Hollywood Garden's behalf. If Hollywood Garden is ultimately successful in that lawsuit, Li will owe Hollywood Garden—almost wholly owned by Liang because of the constructive trust in this lawsuit—damages for the amounts Hollywood Garden incurred as a result of Li's wrongdoing. Liang will have a judgment against Li for those same damages as a function of this case. And Li will ultimately have paid directly to Liang substantially more than he agreed to invest, but will have no ownership interest in Hollywood Garden moving forward.

Because I agree that Li has not demonstrated error on his appeal, I concur in the judgment on Li's appeal. But because I would conclude that Liang has not demonstrated that he was entitled as a matter of law to an upward $2 million reformation of the jury's verdict and the judgment, I would affirm the trial court's judgment in its entirety.

For those reasons, I concur in part and dissent in part.


CHANEY, J.


7